UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MISSION PHARMACAL COMPANY;

   *Plaintiff/Counter-Defendant*,

v.                                 Case No.  SA-20-CV-01454-JKP

MOLECULAR BIOLOGICALS, INC.;

   *Defendant/Counter-Plaintiff*.


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     This case arises from a contract dispute between two pharmaceutical companies. Plaintiff Mission Pharmacal Company sues Defendant Molecular Biologicals, Inc. for breach of contract and quantum meruit, alleging Molecular Biologicals owes Mission Pharmacal more than $2 million for returned goods and unpaid fees. ECF No. 65. Defendant Molecular Biologicals avers it is not obligated to reimburse Mission Pharmacal for returns made to fulfill Mission Pharmacal's business and contractual obligations to third parties. ECF No. 68. Molecular Biologicals also brings a counterclaim against Mission Pharmacal for breach of contract and conversion, alleging Mission Pharmacal failed to perform under the parties' contract and improperly destroyed and quarantined Molecular Biologicals' returned goods. *Id*. The parties filed cross Motions for Summary Judgment, both of which the Court denied. ECF Nos. 34, 40-1, 64.

     The case was tried to the Court without a sitting jury. Trial commenced on March 6, 2023 and concluded on March 8, 2023. Both parties moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The Court deferred ruling on the motions and gave the

parties until March 24, 2023 to file amended proposed findings of fact and conclusions of law, which both parties did. ECF Nos. 101, 102.

The Court has reviewed the record and the evidence presented at trial. The Court has made determinations as to the relevancy and materiality of the evidence, assessed the credibility of the witnesses, and ascertained for its purposes the probative value of the evidence presented. After such consideration, the Court finds the following facts have been proven by a preponderance of the evidence, and applying law to such facts, makes the following conclusions of law.

Namely, Mission Pharmacal takes nothing from its breach of contract and quantum meruit claims for reimbursement. Because Mission Pharmacal takes nothing from its claims for reimbursement, Molecular Biologicals takes nothing for its counterclaims. Finally, Mission Pharmacal is entitled to recover from Molecular Biologicals the principal amount of $60,508 for unpaid service fees, plus a 1% per month finance charge, attorney's fees, and any appropriate pre- and post-judgment interest.

### SUMMARY OF THE CASE

On its face, this appears to be a case about Molecular Biologicals' failure to reimburse its business partner, Mission Pharmacal, for about $1.7 million in returned goods. In reality, however, Molecular Biologicals has no obligation to reimburse Mission Pharmacal. When the parties' business relationship began, Molecular Biologicals was a small, Texas-based, start-up pharmaceutical company seeking to market its prescription wound care products. Mission Pharmacal, a larger, established pharmaceutical company with 77 years of experience in the industry, offered to use its relationships with wholesale distributors to bring Molecular Biologicals' products to market. Specifically, Mission Pharmacal offered to sell Molecular

Biologicals' products to the "big three" wholesale distributors—AmerisourceBergen Corporation, Cardinal Health, and McKesson Corporation—which supply more than 90% of U.S. pharmacies.

At the time that Mission Pharmacal and Molecular Biologicals entered into an agreement, both companies overestimated the demand for Molecular Biologicals' products to be $55 million for the first year. Based on this projection, Mission Pharmacal distributed more than $2 million of Molecular Biologicals' products to the "big three" wholesalers. When it later became apparent the products were not selling, the wholesalers turned to Mission Pharmacal—the company with whom they had business and contractual relationships—seeking reimbursement for returns. Mission Pharmacal accepted those returns to maintain its business relationships and fulfill its contractual obligations to the wholesalers, incurring a debt on Molecular Biologicals' behalf. Mission Pharmacal then turned to Molecular Biologicals seeking reimbursement for the returns.

This case would be simple if Molecular Biologicals were contractually obligated to reimburse Mission Pharmacal for returns. But the parties' contract, which Mission Pharmacal drafted, does not say who pays for returns. Now the parties ask the Court to determine whether Molecular Biologicals is responsible for reimbursing Mission Pharmacal for the wholesalers' returns. Because the parties' contract does not say who pays for returns, and Molecular Biologicals derived no benefit from Mission Pharmacal's acceptance of returns, the Court finds Molecular Biologicals is not liable for the returns, both under the terms of the parties' contract and in equity. Because Mission Pharmacal does not recover on its reimbursement claim, the Court finds Molecular Biologicals has no damages and therefore takes nothing from its counterclaim.

The Court separately finds Molecular Biologicals is liable to Mission Pharmacal for unpaid service fees, plus a finance charge, attorney fees, and interest related to the unpaid fees.

## PARTIES

Plaintiff/Counter-Defendant Mission Pharmacal Company is a 77-year-old Bexar County, Texas corporation involved in the manufacture, distribution, and sales of pharmaceutical products.

Defendant/Counter-Plaintiff Molecular Biologicals, Inc., is a start-up pharmaceutical company organized under the laws of Delaware with a principal place of business in Virginia. It manufactures and sells three prescription wound care products—Keragel, KeragelT, and Keramatrix—that are intended to treat ulcers, burns, and wounds caused by the rare genetic condition Epidermolysis Bullosa. Molecular Texas, LLC, the predecessor company of Molecular Biologicals, Inc., was based out of Texas when it entered into a contract with Mission Pharmacal.

## APPLICABLE LAW

Mission Pharmacal brings suit against Molecular Biologicals for breach of contract and quantum meruit, alleging Molecular Biologicals owes Mission Pharmacal more than $2 million for returned goods and unpaid fees. Molecular Biologicals brings a counterclaim against Mission Pharmacal for breach of contract and conversion, alleging Mission Pharmacal failed to perform under the parties' contract and improperly destroyed and quarantined Molecular Biologicals' returned goods. Pursuant to the parties' contract, the Court applies Texas law.

### I.    Breach of Contract

To prevail on a breach of contract cause of action, a plaintiff must prove: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3)

the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).[1] The fundamental tenet of Texas contract law is that an "unambiguous contract will be enforced as written." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). Moreover, a "contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888 (internal quotation marks and citations omitted). Under Texas law, "courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). The Supreme Court of Texas has consistently held that "parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C.*, 266 S.W.3d at 450; *see also Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019) ("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine its meaning."). "We do not start with extrinsic evidence, nor do we credit claims made in litigation of a secret or bespoke meaning that no one not privy to the code reasonably would have understood." *Van Dyke v. Navigator Grp.*, 2023 WL 2053175, at *4 (Tex. Feb. 17, 2023).

---

[1] Mission Pharmacal characterizes the parties' contract as a consignment agreement. The Court asked the parties to consider whether, if it is a consignment agreement, it is a contract for the sale of goods for which the Texas Uniform Commercial Code (UCC) applies. The case law on whether the UCC applies to consignment agreements is sparse, however, the Court finds the UCC would apply to a consignment agreement. Even so, while it does appear that the parties in this case attempted to enter into a consignment agreement, the contract includes other services beyond consignment. Furthermore, Texas common law concepts of contract interpretation apply to both UCC and common law contracts. The Court, therefore, relies on Texas common law concepts to assess the ultimate issue in this case—that is, whether the parties' contract allows Mission Pharmacal to pass its obligation to reimburse the wholesalers onto Molecular Biologicals.

## II.     Quantum Meruit

Quantum meruit is a state-law equitable remedy founded in unjust enrichment. To prevail on a cause of action for quantum meruit, a plaintiff must establish: "(1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Vortt Expl. Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). It is insufficient "for a plaintiff to simply show that his actions benefitted the defendant"; rather, the "plaintiff must show that his efforts were undertaken for the person sought to be charged." *Angelina Emergency Medicine Assocs. PA v. Health Care Service Corp.*, 506 F. Supp. 3d 425, 432, 436–37 (N.D. Tex. 2020); *see also Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 437 (Tex. 2023) ("Serving a defendant's customers is hardly the same as serving the defendant itself."). Moreover, "'a ripened obligation to pay money . . . hardly can be called a benefit.'" *Tex. Med. Res.*, 659 S.W.3d at 437 (Tex. 2023) (quoting *Angelina Emergency*, 506 F. Supp. 3d. at 432).

## III.     Conversion

Conversion is "'[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights…'" *Ojeda v. Wal-Mart Stores, Inc.,* 956 S.W.2d 704, 707 (Tex. App.—San Antonio 1997, pet. denied). To prevail on a cause of action for conversion, a plaintiff must establish: "(1) plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an

unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) plaintiff made a demand for the property; and (4) defendant refused to return the property." *Tow v. Amegy Bank N.A.*, 976 F. Supp. 2d 889, 907 (S.D. Tex. 2013); *Liberty Mut. v. Kinser*, 82 S.W.3d 71, 79 (Tex. App.—San Antonio 2002, pet. withdrawn).

## FINDINGS OF FACT

Prior to trial, Molecular Biologicals filed several motions in limine challenging evidence offered by Mission Pharmacal as inadmissible parol evidence. The Court denied the motions, noting that, in addition to its breach of contract claim, Mission Pharmacal has a quantum meruit claim for which the parol evidence rule does not apply. Moreover, courts may consider circumstantial evidence to "give the contract a meaning consistent with that to which its terms are reasonably susceptible." *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889. The Court, therefore, heard evidence that falls outside the four corners of the contract, keeping in mind that, under Texas law, the Court's "primary objective in construing contracts to give effect to the written expression of the parties' intent." *Id*. at 888.

Furthermore, because there is no "gatekeeper" issue in the absence of a jury, the Court heard all evidence and determined the reliability of the parties' expert witnesses during trial. The admissibility standards articulated in Federal Rules of Evidence 701 and 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) are intended to protect juries from hearing inadmissible testimony. However, as the Fifth Circuit has noted, "the importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321, 330 (5th Cir.2010); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). Because the Court does not rely on any

evidence for an improper purpose, any concerns about the admission of inadmissible testimony do not apply here. The Court bases its findings on evidence it determined to be reliable and relevant.

### I. The Parties' Contract

The parties agree that on September 1, 2017, they entered into a valid contract titled Master Service Agreement (MSA), under which Mission Pharmacal agreed to provide exclusive third-party logistics (3PL) and trade services on behalf of Molecular Biologicals. The MSA incorporates two Statements of Work (SOWs), for 3PL services and trade services. At trial, witnesses described 3PL services as those which relate to the shipment, tracking, and storage of Molecular Biologicals' products. Molecular Biologicals CEO Kevin Combs described 3PL services as services the general public would associate with a company like FedEx, noting some smaller pharmaceutical companies use FedEx for 3PL services. Under the trade services SOW, Mission Pharmacal agreed to market Molecular Biologicals' products to the "big three" wholesale distributors (AmerisourceBergen, Cardinal, and McKesson) and, once Molecular Biologicals' products were sold to the wholesalers, manage ongoing relationships with the wholesalers related to those products.

Notably, nothing in the MSA or the incorporated SOWs says who is responsible for reimbursing the wholesalers for returned products. The absence of such language is particularly noteworthy in light of the fact that Mission Pharmacal's agreements with the wholesalers have express language saying Mission Pharmacal will reimburse the wholesalers for returns. The MSA does contemplate that returns will occur. Specifically, paragraph 2(c) of the MSA says: "All product returns shall be processed and handled by Mission in accordance with the SOW." But the SOWs offer few details as to how returns will be processed and handled. The only

references to returns relate to Mission Pharmacal's fees: a "pricing" table in the 3PL services SOW lists Mission Pharmacal's fees for returns-related tasks and a reference in the trade services SOW refers to "returns processing" in a list of tasks which are included in Mission Pharmacal's 2% standard distribution services fee. The SOWs also list "chargeback management" and "chargeback processing" as tasks Mission Pharmacal will perform. Witnesses at trial described "chargebacks" as a process in which wholesalers deduct from future invoices an amount owed to them for past returns, rebates, discounts, or other promotions—similar to a merchandise credit in a retail transaction. Mission Pharmacal argues these references to "chargebacks" signify the parties' intent that Molecular Biologicals will repay Mission Pharmacal for returned goods. But the contract says nothing to that effect.

Mission Pharmacal relies on language in paragraph 2(a) of the MSA which says it will act as Molecular Biologicals' "exclusive third-party logistics distribution agent," to support its contention that the parties entered into a principal-agent relationship under which Mission Pharmacal was authorized to reimburse the wholesalers for returns on Molecular Biologicals' behalf. This argument is foreclosed, however, by paragraph 5(f) of the MSA, which states: "Except as may be specifically provided herein, neither of the Parties shall hold itself out as the agent of the other, nor, shall either of the Parties incur any indebtedness or obligation in the name of the other Party." This provision precludes Mission Pharmacal from incurring a debt or obligation on Molecular Biologicals' behalf. Moreover, because the MSA does not specifically authorize Mission Pharmacal to reimburse the wholesalers for returns on Molecular Biologicals' behalf, Mission Pharmacal was not authorized to hold itself out as Molecular Biologicals' agent for reimbursement of returns.

Mission Pharmacal further relies on paragraph 15(a) of the MSA, which says "[t]itle to all Products shall remain with [Molecular Biologicals] at all times under this Agreement" to argue that Molecular Biologicals retained title to any products the wholesalers returned and, therefore, it was responsible for reimbursing Mission Pharmacal for those returns. However, because the MSA does not authorize Mission Pharmacal to reimburse the wholesalers for returns on Molecular Biologicals' behalf, any such transactions were not made "under [the] Agreement." Molecular Biologicals' position is that title transferred to the wholesalers when they purchased products from Mission Pharmacal and Mission Pharmacal then obtained title when it accepted returns.

Having summarized the legally relevant aspects of the parties' contract, the Court now summarizes its findings on how the parties' business relationship operated in practice—both before and after the returns that gave rise to this lawsuit.

## II.    Sales and Returns

When the parties' business relationship began, Molecular Biologicals was a small, start-up pharmaceutical company seeking to market its new wound care products. The San Antonio company was majority owned and operated by internist Dr. Arturo Martinez and his brother, Armando Martinez, who works in real estate. Mission Pharmacal is a 77-year-old San Antonio company involved in manufacturing and sales of its own and other companies' pharmaceutical products. Mission Pharmacal offered to help bring Molecular Biologicals' products to market by providing logistics support and introducing their products to the "big three" wholesale distributors that supply more than 90% of U.S. pharmacies. Mission Pharmacal also offered to market Molecular Biologicals' products to prescribers, but Molecular Biologicals declined that

service. The parties projected Molecular Biologicals' products would be worth approximately $55 million in the first year.

After the parties signed the MSA, they worked together to develop a trade letter to be sent to potential customers, introducing Molecular Biologicals and its products and announcing the parties' relationship with each other. They also agreed to use Mission Pharmacal's Returned Goods Policy for accepting returns, and Molecular Biologicals adopted its own Returned Goods Policy which mirrors Mission Pharmacal's. The policy states that unexpired product within six months of its expiration date, but no more than six months past its expiration date, is eligible for return. The Court finds the trade letter and Returned Goods Policies are not contracts or addendums to the contract, but rather business documents intended to communicate the companies' policies to their customers.

Following some initial planning meetings, Mission Pharmacal's Trade Relations and National Accounts Director Tom Oglesbee began meeting with the "big three" wholesalers to introduce them to Molecular Biologicals' products. Oglesbee's meetings were successful, and between January 2018 and April 2018, Mission Pharmacal sold $2,387,704 of Molecular Biologicals' products to the "big three" wholesalers. Mission Pharmacal then remitted to Molecular Biologicals the sales proceeds for these products, less the wholesalers' fees and Mission Pharmacal's 2% fee, in the amount of $2,106,176.

During the course of this first series of sales, in January 2018, Cardinal and McKesson notified Mission Pharmacal that some Molecular Biologicals products had damaged packaging and would be returned or destroyed. Pursuant to the wholesalers' agreements with Mission Pharmacal, the wholesalers obtained reimbursement for returned or destroyed Molecular Biologicals products using the "chargeback" method—that is, by deducting the cost of returned

or destroyed products from their payment to Mission Pharmacal on invoices for other sales. Mission Pharmacal then deducted the cost of returned or destroyed products from the sales proceeds it transferred to Molecular Biologicals, and Molecular Biologicals did not object.

After the initial 2018 sales, over the next two-year period between April 2018 and July 2020, Mission Pharmacal sold only $48,865 of Molecular Biologicals' products. Beginning in 2019, the wholesalers notified Mission Pharmacal that Molecular Biologicals' products were not selling and they would be returning the products. The returns were attributed to a lack of "pull through," meaning prescribers were not writing prescriptions for Molecular Biologicals' products and, as a result, pharmacies were not buying them from the wholesalers. Email correspondence between the parties shows Dr. Martinez sought Mission Pharmacal's assistance in convincing the wholesalers to keep Molecular Biologicals' products in their inventory, or to replenish their inventory with new products, to buy Molecular Biologicals more time to sign contracts with large customers like the U.S. Department of Veterans Affairs and deploy its sales team to market the products to prescribers. The record shows Oglesbee agreed to do so.

Nonetheless, in February 2019, AmerisourceBergen Corporation (ABC) notified Mission Pharmacal of its plan to make the first large series of returns. In an email between Mission Pharmacal's Jean Schmidt and Molecular Biologicals' Dr. Martinez, Schmidt asks whether she should direct ABC to follow the Returned Goods Policy and Dr. Martinez writes, "Yes June that is fine." Mission Pharmacal argues that, with this email, Dr. Martinez authorized it to accept the ABC returns. Molecular Biologicals says Dr. Martinez only agreed to direct ABC to follow the Returned Goods Policy. Furthermore, contrary to the Returned Goods Policy, ABC's returned goods had more than six months left on their expiration dates—a fact which Mission Pharmacal did not reveal to Molecular Biologicals until just before it filed this lawsuit. This information

would have been relevant to Dr. Martinez because, as witnesses at trial testified, a small company like Molecular Biologicals can benefit from sales of short-dated product, even if at a discount.

Between July and September 2019, Mission Pharmacal accepted $602,353 in ABC returns. Unlike previous returns, Mission Pharmacal was unable to charge Molecular Biological for the ABC returns by deducting from sales proceeds, because there were no sales proceeds from which to deduct. Email communications between the parties at the time suggest that, early on, Dr. Martinez believed he had to reimburse Mission Pharmacal for the returns. However, subsequent communications suggest Molecular Biologicals later determined it was not obligated to reimburse Mission Pharmacal for the returns and it did not intend to do so.

At some point after the initial ABC returns, the parties' communications broke down. Yet Mission Pharmacal continued to accept returns from the wholesalers, and ultimately reimbursed the wholesalers for $1,780,027 in returns of Molecular Biologicals' products. The Court finds that Mission Pharmacal provided these credits to the wholesalers to comply with its contractual obligations and maintain its business relationships with them. Mission Pharmacal President and CFO Tom Dooley testified that the "big three" wholesalers represent $70 million of Mission Pharmacal's nearly $100 million in annual revenue. Furthermore, Mission Pharmacal's contracts with the wholesalers require it to reimburse them for returns using the "chargeback" model. This explains why Mission Pharmacal continued to accept returns on Molecular Biologicals' behalf even after the parties' relationship had deteriorated to the point where they were no longer communicating with each other. Mission Pharmacal was contractually obligated—to the wholesalers—to do so.

At trial, current Molecular Biologicals CEO Combs, who has 35 years of experience in the industry, described the contractual arrangement in this case as highly unusual. According to Combs, pharmaceutical manufacturers like Molecular Biologicals typically have their own, separate contracts with the "big three" wholesalers, even when they contract with a third party like Mission Pharmacal for logistics services. This type of arrangement would have allowed Molecular Biologicals to deal directly with the wholesalers when they sought returns, and determine its own process for issuing reimbursement. In this case, however, because Mission Pharmacal was operating under its contracts with the wholesalers, it was obligated to reimburse the wholesalers for Molecular Biologicals' returned products. Mission Pharmacal's retained expert, Robert Giacalone, testified that, in his opinion, Molecular Biologicals had to rely on Mission Pharmacal's contracts with the "big three" wholesalers because the wholesalers would not have contracted with a company as small as Molecular Biologicals. But the Court finds credible Combs' testimony that he has personally worked for small companies that contracted directly with the wholesalers.

## III.    Monthly Service Fees

In addition to its reimbursement claim, Mission Pharmacal alleges Molecular Biologicals breached the MSA by failing to pay monthly fees for nine months. The fee structure agreed to by the parties is described in the SOWs incorporated into the MSA. Section 2(a) of the trade services SOW says Molecular Biologicals would pay a "monthly administration" fee of $5,000 per month for the first six months of the contract and $3,500 per month thereafter. Paragraph 6 of the MSA says Molecular Biologicals would pay Mission Pharmacal's monthly invoices within thirty days of receipt, failure of which would result in a 1% per month finance charge on all amounts due. The MSA further provides that, if Molecular Biologicals disputes any fee

identified in the invoice, it must pay the undisputed amount and send Mission Pharmacal written notice setting forth any amount in dispute and the basis for such dispute, within thirty days of receiving the invoice. Finally, paragraph 6(f) of the MSA says if Molecular Biologicals fails to pay Mission Pharmacal for the invoices due under the MSA, Mission Pharmacal is entitled to "all costs of collection, including reasonable attorney's fees."

The parties stipulate that Mission Pharmacal sent Molecular Biologicals monthly service fee invoices for each month from January 2020 through September 2020, totaling $60,508, which Molecular Biologicals failed to pay. Mission Pharmacal proffered evidence that, during that time, Molecular Biologicals had not terminated the MSA and Mission Pharmacal continued to perform services, including continued storage of Molecular Biologicals' products, communicating with wholesalers on Molecular Biologicals' behalf, and processing and shipping Molecular Biologicals' products. Molecular Biologicals avers that, for the months in question, Mission Pharmacal failed to provide contracted services, such as weekly meetings and weekly inventory reports. But Molecular Biologicals neither paid the undisputed amount for the services Mission Pharmacal did perform, nor did it object in writing upon receipt of Mission Pharmacal's invoices.

## CONCLUSIONS OF LAW

The Court now turns to its conclusions of law on Mission Pharmacal's breach of contract and quantum meruit claims regarding reimbursement for returned goods—and Molecular Biologicals' breach of contract and conversion counterclaims. The Court then separately considers Mission Pharmacal's breach of contract claim for unpaid fees.

I.      **Mission Pharmacal's Claims for Reimbursement for Returns**

Mission Pharmacal seeks reimbursement from Molecular Biologicals for the wholesalers'

returns, alleging breach of contract and, in the alternative, quantum meruit.

a.   **Breach of Contract Theory**

To prevail on its breach of contract cause of action, Mission Pharmacal must prove: (1) a

valid contract exists; (2) Mission Pharmacal performed or tendered performance as contractually

required; (3) Molecular Biologicals breached the contract by failing to perform or tender

performance as contractually required; and (4) Mission Pharmacal sustained damages due to the

breach." *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 890. As to its claim for reimbursement for

returns, Mission Pharmacal fails to prove Molecular Biologicals breached the contract because

there is no requirement under the parties' contract that Molecular Biologicals reimburse Mission

Pharmacal for returns.

Mission Pharmacal has not identified any provisions in the MSA or SOWs that require

Molecular Biologicals to reimburse Mission Pharmacal for amounts credited or paid to

wholesalers by Mission Pharmacal for returned products. Rather, the MSA says returns will be

"processed and handled" by Mission Pharmacal and the SOWs include "chargebacks" and

"returns" in lists of  services Mission Pharmacal will provide. These references do not establish

an obligation for Molecular Biologicals to reimburse Mission Pharmacal for returns. This is

particularly clear in light of the fact that Mission Pharmacal's agreements with the wholesalers

include language saying Mission Pharmacal will reimburse the wholesalers for returns, but its

agreement with Molecular Biologicals has no such language. Furthermore, references in the

MSA to Mission Pharmacal as Molecular Biologicals' distribution "agent" do not create a

principal-agent relationship granting Mission Pharmacal authority to reimburse the wholesalers

for returns on Molecular Biologicals' behalf. To the contrary, paragraph 5(f) of the MSA says "neither of the Parties shall hold itself out as the agent of the other," and goes on to expressly preclude Mission Pharmacal from incurring a debt or obligation on Molecular Biologicals' behalf. Moreover, the MSA's statement that title to the products remains with Molecular Biologicals "at all times under this Agreement" does not apply to Missions Pharmacal's reimbursement of the wholesalers because those transactions occurred outside the agreement. Finally, the MSA contains a merger clause that precludes consideration of extrinsic evidence and prohibits any amendment, supplement, or modification of the MSA except by a writing signed by both parties. There is no evidence of any such writing. Mission Pharmacal argues the parties' signed trade notification letter evinces an intent to amend the MSA; however, the trade letter is not an agreement between the parties but rather a joint communication intended for the parties' potential customers.

The Court, therefore, finds the contract unambiguously does not require Molecular Biologicals to reimburse Mission Pharmacal for returns. Consistent with Texas law, the Court "will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco Inc.*, 925 S.W.2d at 646. Because the contract is unambiguous, the Court does not consider Mission Pharmacal's evidence of industry practices or extrinsic communications before or after execution of the MSA. *David J. Sacks, P.C.*, 266 S.W.3d at 450; *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 206; *Van Dyke*, 2023 WL 2053175, at *4. The Court finds Mission Pharmacal credited the wholesalers based on its own contractual obligations to the "big three" wholesalers. Mission never contracted with Molecular Biologicals for those obligations to be passed through to Molecular Biologicals.

Therefore, Mission Pharmacal failed to prove that Molecular Biologicals breached the MSA by failing to reimburse Mission Pharmacal for the returned products.

### b.  Quantum Meruit Theory

Mission Pharmacal offers an alternate quantum meruit theory for its claim for reimbursement. To prevail on its cause of action for quantum meruit, Mission Pharmacal must establish: (1) Mission Pharmacal rendered or furnished valuable services or materials; (2) for Molecular Biologicals; (3) which services and materials were accepted by Molecular Biologicals, used and enjoyed by Molecular Biologicals; (4) under such circumstances as reasonably notified Molecular Biologicals that Mission Pharmacal in performing such services was expecting to be paid by Molecular Biologicals. *Vortt Expl. Co., Inc.*, 787 S.W.2d at 944. "A party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005).

Mission Pharmacal failed to prove that it provided valuable extra-contractual services to Molecular Biologicals for which it was not paid. The benefits that Mission Pharmacal identified in support of its quantum meruit claim—distributing Molecular Biologicals' products to the wholesalers, remitting the sales proceeds to Molecular Biologicals, and processing the returns—are included in the MSA and are therefore not the proper subject of a quantum meruit claim. Moreover, Mission Pharmacal's alleged damages have no relation to any "benefit" to Molecular Biologicals. The money Mission Pharmacal seeks to recover is the value Mission Pharmacal credited to the "big three" wholesalers, not value provided to Molecular Biologicals. Indeed, the benefit of crediting the wholesalers redounded to Mission Pharmacal in the form of maintaining its $70 million per year business relationship with the wholesalers, not to Molecular Biologicals, which had no contract with the wholesalers. Mission Pharmacal's witnesses claimed that Mission

Pharmacal provided credit to Molecular Biologicals by paying the wholesalers. But this is not a valuable service to Molecular Biologicals, since Molecular Biologicals was under no obligation to pay the wholesalers. *See Angelina Emergency*, 506 F. Supp. 3d at 432 ("[S]addling someone with a debt to repay hardly qualifies as a benefit."). The Court, therefore, denies Mission Pharmacal relief on its quantum meruit cause of action.

## II.    Molecular Biologicals' Counterclaims

Molecular Biologicals argues the MSA did not authorize Mission Pharmacal to destroy or quarantine Molecular Biologicals' returned products. This argument is foreclosed by Molecular Biologicals' argument—in support of its defense to Mission Pharmacal's claims for reimbursement for the wholesalers' returns—that Mission Pharmacal obtained title to the returned products when it accepted the wholesalers' returns. In any event, Molecular Biologicals conceded before trial that because it was fully paid for the products that are the subject of its counterclaims, unless Mission Pharmacal recovers on its claims for reimbursement, Molecular Biologicals has no damages to support its counterclaims. The Court, therefore, finds that because Mission Pharmacal takes nothing from its claims for reimbursement, Molecular Biologicals takes nothing for its counterclaims.

## III.    Mission Pharmacal's Claim for Unpaid Service Fees

The Court does, however, find evidence of Molecular Biologicals' breach in its failure to pay Mission Pharmacal's service fees. Under the MSA, Molecular Biologicals was required to pay Mission Pharmacal's invoices within 30 days of receipt or provide written notice disputing the amount owed. For the months of January 2020 through September 2020, Mission Pharmacal invoiced Molecular Biologicals and Molecular Biologicals neither paid the invoices nor disputed the amount owed. Furthermore, Mission Pharmacal offered evidence at trial that it continued to

perform services under the contract during that time period, including continued storage of Molecular Biologicals' products, communicating with wholesalers on Molecular Biologicals' behalf, and processing and shipping Molecular Biologicals' products. Molecular Biologicals forfeited its argument that Mission Pharmacal failed to perform certain tasks by not objecting within 30 days of receiving Mission Pharmacal's invoices.

The Court, therefore, finds that Mission Pharmacal is entitled to recover on its breach of contract claim against Molecular Biologicals' for failure to pay January 2020 through September 2020 invoices, totaling $60,508. The Court further finds Mission Pharmacal is entitled to a 1% per month finance charge and attorney's fees, as provided by the MSA, and any appropriate pre- and post-judgment interest available under 28 U.S.C. § 1961.

## CONCLUSION

In accordance with these findings of fact and conclusions of law, Mission Pharmacal takes nothing from its breach of contract and quantum meruit claims for reimbursement. Because Mission Pharmacal takes nothing from its claims for reimbursement, Molecular Biologicals takes nothing for its counterclaims. Finally, Mission Pharmacal is entitled to recover from Molecular Biologicals the principal amount of $60,508 for unpaid service fees, plus a 1% per month finance charge, attorney's fees, and any appropriate pre- and post-judgment interest.

Mission Pharmacal shall file, **on or before April 18, 2023**, its briefing on the amount owed to it for the 1% per month finance charge and attorney's fees available under the parties' contract, and any pre- and post-judgment interest available under 28 U.S.C. § 1961. Molecular Biologicals shall file, **on or before April 25, 2023**, any response to Mission Pharmacal's briefing. The Court will enter final judgment by separate order.

It is so ORDERED.
SIGNED this 4th day of April, 2023.

_____
JASON  PULLIAM
UNITED STATES DISTRICT JUDGE